[No. A106299, A106423. First Dist., Div. Five. Mar. 30, 2005.]

MICHAEL McMAHAN et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

COUNSEL

Oren Sellstrom, Lawyers' Committee for Civil Rights, Stephen Bingham; Bay Area Legal Aid and Michael Keys for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, and Wayne Snodgrass, Deputy City Attorney, for Defendants and Respondents.

OPINION

**JONES, P. J.**—San Francisco voters adopted Proposition N, an initiative ordinance popularly known as "Care Not Cash," to address the city's persistent homeless problem. The measure required that San Francisco provide in-kind benefits such as permanent housing and meals to eligible indigents, replacing the majority of an individual's existing cash grant with those guaranteed services. The measure also mandated a baseline appropriation to fund the in-kind services.

But after the voters approved the initiative, San Francisco announced that the funding provisions of the law were unenforceable, provoking appellants' challenge by a petition for a writ of mandate.

Appellants in this action, two homeless men who receive relief and support from San Francisco, contend the entire Care Not Cash ordinance must be invalidated, because the funding provisions of the law are not enforceable. We will apply a severance clause contained in the ordinance to allow the valid portions of the law to remain in effect.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

San Francisco, like all counties in California, is obligated to provide relief and support to its indigent population. (Welf. & Inst. Code, § 17000 et seq.) Prior to November 2002, San Francisco satisfied that obligation by operating

four closely related programs known collectively as the "County Adult Assistance Programs," or CAAP. The CAAP programs provided cash benefits to indigent adults, with grants ranging from $320 to $395 per month. Although emergency shelter and meal services were sometimes available to CAAP recipients, this did not affect the amount of cash recipients received.

In May 2002, two individuals, one of whom was then board of supervisors member and now Mayor Gavin Newsom, began to circulate a petition seeking voter approval of an initiative ordinance which they entitled Care Not Cash. The ordinance would amend San Francisco's Administrative Code by making identical changes to each of San Francisco's four CAAP programs.

The primary focus of the initiative, reflected in its name, was a proposed change in the way relief and support is provided to eligible indigents. Specifically, under the initiative, indigents would receive direct "care" instead of a "cash" benefit each month. This change would be accomplished by placing on San Francisco the obligation to provide indigents with "housing, utilities, and meals." The value of the services provided would then be deducted from an indigent's cash grant. Through this procedure, cash grants could be reduced to as little as $59 per month. The services were "guaranteed" in that if San Francisco was unable to provide them, "recipients shall receive the cash assistance equivalent to the income-in-kind value of housing, utilities, and/or meals."

The initiative also included a funding mandate that required San Francisco to allocate a fixed portion of its budget each year to services for the homeless. The relevant language in section 20.60.12 of the San Francisco Administrative Code, titled "Funding" stated, "A baseline appropriation for housing and related services provided as in-kind aid shall be established using the City and County of San Francisco FY 2002–2003 Annual Appropriation Ordinance and any supplemental appropriations for the amount of cash aid payments to applicants and recipients who declare themselves to be homeless. In subsequent fiscal years, this baseline amount shall be appropriated to the Department of Human Services to fund housing and related services for homeless adults without dependents. This funding may be used to support, but shall not be limited to, some or all of the following: hotel master lease programs, permanent supportive housing, improvements of conditions in existing shelters, expansion of shelter capacity, mental health and substance abuse treatment, outreach, a fund for rental deposits, SSI advocacy programs, rep-payee services, case management and meals for the homeless population through direct services and/or contracts."

The Care Not Cash initiative qualified for the November 2002 ballot and was designated as Proposition N. It passed, receiving nearly 60 percent of the vote.

After the election, San Francisco began taking the steps necessary to implement the Care Not Cash law's change from monthly cash grants to direct services. Then in June 2003, the San Francisco Budget Analyst informed the board of supervisors that the funding mandate was not enforceable: "the City Attorney's Office advises that the funding language regarding the baseline appropriations, as contained in Proposition N, cannot be mandatory and must be interpreted as a policy recommendation or advisory only for future Mayors and Boards of Supervisors. Therefore . . . based on the City Attorney's opinion, the $13,904,979 level of funding may or may not be included by the City for cash payments, housing, food and support services in future years to homeless adults."

Shortly after the budget analyst made his announcement, appellants, who receive CAAP support, filed a petition for a writ of mandate. As is relevant here, they asked the court to invalidate the entire Care Not Cash law because the funding mandate was not enforceable and the reminder of the law could not be severed from the invalid portion.[1]

San Francisco conceded that the funding mandate was not enforceable. This was so, because the power of the mayor and the board of supervisors to draft and enact a budget is set forth in San Francisco's City Charter, while the Care Not Cash initiative enacted an ordinance. Under well-settled law, an ordinance cannot amend a city charter. (See *City and County of San Francisco v. Patterson* (1988) 202 Cal.App.3d 95, 104–105 [248 Cal.Rptr. 290].) San Francisco urged the court to effectuate the voters' intent by interpreting the funding mandate as a policy declaration that had no binding effect.

The trial court accepted San Francisco's argument and rejected appellants' petition, ruling the funding mandate was "discretionary in effect, not mandatory." This appeal followed.

---

[1] The petition also alleged the Care Not Cash law was invalid because only the board of supervisors could enact that type of law. Appellants have abandoned that argument in light of recent case law. (See *Pettye v. City & County of San Francisco* (2004) 118 Cal.App.4th 233 [12 Cal.Rptr.3d 798].) In addition, the petition sought to invalidate the Care Not Cash law on due process grounds. In light of concessions San Francisco made in its brief on appeal, appellants have abandoned that argument.

## II. *DISCUSSION*[2]

■ Fundamentally appellants seek to invalidate the entire Care Not Cash law. The parties agree this is a question of law that this court must decide de novo on appeal. (*International Federation of Professional & Technical Engineers v. City and County of San Francisco* (1999) 76 Cal.App.4th 213, 224 [90 Cal.Rptr.2d 186].)

In the trial court, appellants argued that the entire Care Not Cash law is invalid because the funding mandate (1) is mandatory not discretionary; (2) is unenforceable because it conflicts with provisions of San Francisco's Charter, which vests appropriations authority in the mayor and board of supervisors; and (3) cannot be severed from the remainder of the law.

Our resolution of these arguments has been simplified because San Francisco now concedes the funding mandate is mandatory. San Francisco also agrees that the funding mandate is not enforceable because it conflicts with the city charter. Thus, the sole issue we must decide is whether the valid portion of the Care Not Cash law that requires a change from assistance through cash to assistance through services can be severed from the admittedly invalid funding mandate.

Critically, the Care Not Cash law contains a severance clause that states, "If any section, subsection, provision or part of this initiative ordinance, or its application to any person or circumstances, is held to be unconstitutional or invalid, the remainder of this ordinance, and the application of such provision to other persons or circumstances, shall not be affected."

■ A severance clause " '. . . normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable.' [Citation.]" (*Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d

---

[2] While this case was being briefed, San Francisco and appellants each filed a request for judicial notice. San Francisco asked this court to take judicial notice of materials that were noticed by the trial court, and ballot materials contained in San Francisco's Voter Information Pamphlet for the November 2003 election. Appellants asked us to take judicial notice of a letter brief San Francisco submitted in a prior writ proceeding. We deferred ruling on the requests until the merits of the appeal. (See *People v. Preslie* (1977) 70 Cal.App.3d 486, 493–494 [138 Cal.Rptr. 828].) Having now considered the requests, we grant them in part and deny them in part. San Francisco's request is granted to the extent it seeks judicial notice of materials that were noticed by the trial court. (See Evid. Code, § 459, subd. (a)(1).) All remaining requests are denied. An appellate court can, but is not required to, take judicial notice of documents that were not presented to the trial court in the first instance. (See, e.g., *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242].) We exercise our discretion and decline to take judicial notice of the remaining documents San Francisco and appellants have identified.

315, 331 [118 Cal.Rptr. 637, 530 P.2d 605], quoting *McCafferty v. Board of Supervisors* (1969) 3 Cal.App.3d 190, 193 [83 Cal.Rptr. 229].) But a severance clause coupled with mechanical severability is not conclusive on this question. " 'The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable.' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247], quoting *Santa Barbara Sch. Dist. v. Superior Court, supra,* 13 Cal.3d at p. 331.)

■ "The cases prescribe three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable." (*Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d at p. 821.) All three criteria must be satisfied. (*Ibid.*)

Here, appellants concede the invalid funding mandate is grammatically severable. We therefore focus on the second and third factors, turning to the latter factor first.

### A. *Volitional severability*

■ In order for a statute to be volitionally severable " '[T]he provisions to be severed must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment. *The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed* [i.e., validated] *so that it would have separately considered and adopted them in the absence of the invalid portions.*' " (*Gerken v. Fair Political Practices Com.* (1993) 6 Cal.4th 707, 714–715 [25 Cal.Rptr.2d 449, 863 P.2d 694], quoting *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 332–333 [226 Cal.Rptr. 640].)

We conclude that the test is satisfied here. The valid part of Proposition N can be severed from the invalid part.

The Care Not Cash law's core purpose of replacing each indigent's cash grant with services was presented to the electorate as a distinct aim, separate and apart from the measure's funding mandate. The title of the initiative made this clear. It told the voters that indigents would receive "Care Not Cash."

This core goal was reinforced in the "Ballot Question" for Proposition N. It asked the voters, "Shall the City change the way it provides assistance to

qualified homeless individuals by counting the value of housing, shelter and meal services as part of their cash benefit?" The funding mandate was not mentioned.

The description of Proposition N provided by the "Ballot Simplification Committee" in the ballot materials described the two aspects of the initiative separately without drawing a link between them.[3]

The text of the initiative underscored its primary objective. The "Statement of Purpose" begins, "The goal of the Care Not Cash Initiative is to provide all homeless San Franciscans without dependents . . . food, shelter/housing and health services replacing the majority of existing cash grants with these guaranteed services."

The majority of the ballot arguments focus on the change from cash to direct services without mentioning the funding mandate. For example, the argument submitted by the League of Women Voters stated, "San Francisco is the last major County in California to provide a cash grant to the homeless. Other counties like Alameda have converted to a system of providing services, like housing, drug treatment, meals and medical care to the homeless instead of cash. Proposition N will create a similar system here in San Francisco." The Executive Director of the San Francisco Neighbors Resource Center stated, "San Francisco's current system for providing homeless services is not working. In the last decade over 1000 homeless people died on our streets. In that same period of time we spent more than a billion dollars on homeless services. Proposition N, the Care Not Cash Initiative, converts San Francisco from a cash-based system to a service-based system—the same system used in every other major county in California." A community group known as Plan C submitted an argument that stated, "Only two of California's 52 counties provide all cash grants to the homeless—San Francisco is one of them. Other counties, like Alameda, provide mostly services, like housing, drug treatment, meals and medical care to the homeless instead of cash. A service-based system is a compassionate solution, and will prevent hundreds of overdose-related deaths on San Francisco's streets."

---

[3] The paragraph that describes the service change states, "Proposition N is an ordinance that would count housing, shelter and meal services provided to qualified homeless individuals as part of their cash benefit. The City would reduce its cash payments to those individuals based on the value of those services received. The value of those services would be determined using 'In-Kind' charts in current State law. Individuals would continue to receive at least $59 per month in cash. If housing, shelter, or meal services were unavailable, individuals would receive cash payment for the value of those services. Individuals who are removed from a housing or shelter program for breaking its rules could lose all their cash benefits."

The next paragraph describes the funding mandate, and states, "This ordinance would set a minimum funding level for future homeless programs based on what it spends for cash and services in Fiscal Year 2002–3. The City would use this money to provide a range of homeless services, including housing, shelter and meals, or for cash payments."

The language used in other ballot arguments reinforces the conclusion that the change from cash to direct services was the primary aim of the initiative. ("Proposition N will *replace* this all-cash system with services . . . ." (Italics added.) "Care not Cash . . . will allow the city to *shift* resources . . . ." (Italics added.) "funds saved will be *redirected* to real services . . . ." (Italics added.)

These and other materials in the record demonstrate convincingly that the change from cash to direct services was presented to the voters as a distinct goal of the Care Not Cash law. We can say with confidence that " '. . . *the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions.*' " (*Gerken v. Fair Political Practices Com., supra,* 6 Cal.4th at pp. 714–715, quoting *People's Advocate, Inc. v. Superior Court, supra,* 181 Cal.App.3d at pp. 332–333.)

The result we reach is consistent with case law. In *Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d 805, the court held unconstitutional a key provision of Proposition 103, an insurance reform measure. The challenged provision illegally precluded rate adjustments necessary to provide insurers with a fair rate of return. The court concluded the invalid provision was severable from the balance of the measure: "the remainder of the initiative . . . would likely have been adopted by the people had they foreseen the invalidity of the [provision illegally restricting rate adjustments]. The voters who enacted Proposition 103 would presumably prefer rate setting and regulation under the balance of the initiative to the method of setting insurance rates which existed before the initiative was enacted. There is no persuasive reason to suppose the [invalid provision] was so critical to the enactment of Proposition 103 that the measure would not have been enacted in its absence." (48 Cal.3d at p. 822.)

Here, as in *Calfarm,* the voters who enacted Proposition N expressed a preference for a service based system instead of the cash based system that previously was in effect. In addition, there is no persuasive evidence to support the conclusion that the appropriations mandate was "so critical to the enactment of [the Care Not Cash law] that the measure would not have been enacted in its absence." (*Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d at p. 822.)

Appellants contend the valid change from cash to care cannot be severed from the invalid funding mandate because those two aspects of the initiative were presented to the voters together as part of a correlative remedy for a broken homeless service system. Citing the funding provision of San Francisco Administrative Code section 20.60.12, appellants argue the initiative guaranteed that any money saved as a result of reductions in individual cash

grants would have been spent each year on increased housing and services for the qualifying homeless population. According to appellants, allowing the former to go into effect without the latter would violate the voters' intent.

It is true that some ballot materials did focus on the funding mandate, primarily by discussing the increased services that could have been provided under the Care Not Cash law. For example, the law's "Statement of Purpose" also told voters the law would "allow the City of San Francisco to increase mental health treatment services, expand alcohol and substance abuse programs and create more affordable housing."[4] In addition, some ballot materials drew a link between the reduction in spending on cash grants and the potential for an increase in funding for additional services to the indigent. The "Proponent's Argument" in favor of Proposition N said the change would "free up city funds for services and save lives by giving real care rather than inadequate cash." The argument submitted by United States Senator Dianne Feinstein told the voters the initiative would "reduce the cash payments that homeless men and women use to buy drugs and alcohol and redirect that funding into housing, drug treatment, job training, and health care programs."[5] Some newspaper articles that were published prior to the election raised the same theme.[6] An article in the San Francisco Chronicle said Proposition N would "cut general assistance checks to $58 [*sic*] and give the rest of the money to services."

These and the other materials appellants have cited indicate that the Care Not Cash initiative had a dual focus and that one of its goals was to provide an enhanced level of care for the indigent. Furthermore, it may be true that some voters were convinced to support the initiative by the arguments that drew this link between the change from cash to services, and the mandated

---

[4] We note that the language of the challenged funding provision did no more than set a baseline appropriation at the same level as had been adopted in the then current "2002–2003 FY Annual Appropriation Ordinance and any supplemental appropriations." It provided simply that in subsequent fiscal years, "this baseline amount shall be appropriated." No method of increasing funding is included in the ordinance. Rather, existing levels of appropriations were to be redirected to services.

[5] While Senator Feinstein's argument states that some indigents may have used their cash benefit to purchase alcohol and drugs, other arguments make clear that those receiving benefits come from many different segments of society. According to the argument submitted by Public Defender Jeff Adachi, "Not everyone who receives welfare abuses drugs or alcohol. Among the homeless are seniors (21%), veterans (33%) and the disabled (58%) . . . ."

[6] San Francisco contends it is improper to rely on newspaper articles when determining voter intent and that we must rely on the ballot materials alone. Case law supports San Francisco's argument. (See, e.g., *Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 485 [71 Cal.Rptr.2d 606].) However, it is also true that our Supreme Court has relied on such articles in the past. (See, e.g., *California Housing Finance Agency v. Patitucci* (1978) 22 Cal.3d 171, 178 [148 Cal.Rptr. 875, 583 P.2d 729].) We need not resolve this apparent conflict because the newspaper articles are not pivotal to our analysis.

level of funding that might result in enhanced services. In appellants' view the initiative's appeal to voters was a "coupling [of] the reduction in spending on cash grants with an increase in allocations for housing and services."

Nevertheless, the materials we have cited persuade us that the cornerstone of the initiative was the proposed change in the method of valuing benefits. It articulated a commitment of providing greater in-kind services—housing, utilities and/or meals to eligible homeless San Franciscans. The initiative's primary goal was the one embodied by its title: that indigents receive "care" instead of "cash." We are confident that the provisions expressing this change of policy would have received the endorsement of the vast majority of voters, even if the funding mandate were absent. The valid portion can and should be severed from the invalid and should remain in effect.

Appellants contend the valid portion of the Care Not Cash law is not severable from the invalid portion under *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001]. There, our Supreme Court was required to determine the validity of a rent control law that was adopted by the citizens of Berkeley through an initiative amendment to the city charter. The court ruled the law was invalid because its requirement that a five member rent board adjust maximum rents on a unit-by-unit basis was so cumbersome that it deprived landlords of due process. (*Id.* at p. 173.) The court also ruled the remaining portions of the law could not be severed from the invalid portion: "the argument in support of the charter amendment distributed to the electors who voted on its adoption assured them that the measure 'establishes an elected five member Rent Control Board to regulate rents . . . and evictions in Berkeley on a case by case basis. . . . [T]he plan proposed here is extremely flexible [*sic*], with each case handled individually by the Board.' Thus it is by no means clear that the electorate would have approved the measure if the Board had been given broader rental adjustment powers." (*Id.* at pp. 173–174.)

The difference between *Birkenfeld* and this case is a matter of the degree of importance of the invalid provisions in the respective statutes. The Supreme Court's analysis demonstrates that the invalid rent adjustment provisions were a critical part of the law as passed and one that would have proven pivotal in the minds of the voters. That is not the case here. As we have explained, we conclude the voters would have adopted the Care Not Cash law even if they had known the funding mandate was invalid. *Birkenfeld* is distinguishable.

### B. *Functional severability*

██ A law is functionally severable if it is "capable of independent application." (*People v. Library One, Inc.* (1991) 229 Cal.App.3d 973, 989

[280 Cal.Rptr. 400].) "The part to be severed must not be part of a partially invalid but unitary whole. The remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations. They must be capable of separate enforcement." (*People's Advocate, Inc. v. Superior Court, supra,* 181 Cal.App.3d at p. 332.) We conclude these tests are also satisfied.

The portion of the Care Not Cash law that requires San Francisco to provide indigents with direct services instead of cash can be applied independently. It stands on its own and can be implemented fully even if San Francisco cannot validly be required to allocate a fixed portion of its budget each year to services for the indigent. The valid change from cash to services is not rendered vague by the invalid funding mandate nor is it inextricably connected to it by policy considerations. We conclude the valid portion of the Care Not Cash law is functionally severable.

Appellants contend the valid change from cash to care is not functionally severable from the invalid funding mandate because those two provisions are "inextricably connected." (*People's Advocate, Inc. v. Superior Court, supra,* 181 Cal.App.3d at p. 332.) Again, they base their argument on the ballot materials we have discussed that draw a connection between the change from cash to care and the provision of enhanced services through the funding mandate.

The materials appellants have cited do show there was some stated connection between the valid change from cash to care and the invalid funding mandate, to the extent that they express an expectation of an increase in services from a redirection of funds in the amount of the mandated baseline appropriation. But the connection is not an "inextricable" one; at best it reflects hopeful speculation that additional services will be financed through presumed savings from mandatory cuts in the cash grants.[7]

The valid portions of the Care Not Cash law accomplish the law's core purpose of changing the way services are delivered to the indigent. Since that aspect of the law "reflects a 'substantial' portion of the electorate's purpose, that part can and should be severed and given operative effect." (*Gerken v. Fair Political Practices Com., supra,* 6 Cal.4th at p. 715; see also *People v. Salazar-Merino* (2001) 89 Cal.App.4th 590, 600 [107 Cal.Rptr.2d 313].)

---

[7] Ironically, the opponents of Proposition N told the voters repeatedly that funding for enhanced services was not guaranteed. Despite these warnings, the voters passed Proposition N decisively.

## III. *DISPOSITION*

The judgment is affirmed.

Stevens, J., and Gemello, J., concurred.