# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BENITO ACOSTA,
          *Plaintiff-Appellant,*

v.

CITY OF COSTA MESA; ALLAN
MANSOOR, Mayor of the City of
Costa Mesa, in his official and
individual capacities,
          *Defendants-Appellees,*

---

JOHN HENSLEY, Chief of Police,
Costa Mesa Police Department;
DAVID ANDERSEN; DAVID DEHUFF;
JOHN DOEZIE; BRYAN GLASS;
DANIEL GUTH; DAVID MAKIYAMA;
JEFF TOBIN; DEREK TRUSK, in their
official and individual capacities,
          *Defendants-Appellees.*

No. 10-56854

D.C. No.
8:06-cv-00233-
DOC-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
July 9, 2012—Pasadena, California

Filed September 5, 2012

10607

Before: Richard C. Tallman and N. Randy Smith,
Circuit Judges, and Dee V. Benson, District Judge.*

Opinion by Judge Tallman;
Dissent by Judge N.R. Smith

---

*The Honorable Dee V. Benson, United States District Judge for the
District of Utah, sitting by designation.

**COUNSEL**

Belinda E. Helzer, Esq., ACLU Foundation of Southern California, Orange, California, for the plaintiff-appellant.

M. Lois Boback, Esq. (argued) and Daniel K. Spradlin, Esq., Woodruff, Spradlin & Smart, APC, Costa Mesa, California, for the defendants-appellees.

---

## OPINION

TALLMAN, Circuit Judge:

Costa Mesa Municipal Code § 2-61 makes it a misdemeanor for members of the public who speak at City Council meetings to engage in "disorderly, insolent, or disruptive behavior." Benito Acosta ("Acosta") was removed from the Costa Mesa City Council meeting for an alleged violation of the ordinance. Acosta appeals the district court's dismissal of his First Amendment facial challenge to the ordinance. He also appeals the district court's grant of partial summary judgment in favor of the California city and various individual police officers on his state-law free speech claims and his Fourth Amendment claims. A jury returned a defense verdict on all remaining issues submitted for trial. He also appeals the district court's discretionary decisions to admit certain evidence, refusal to give his proposed limiting instruction, denial of his renewed motion as a matter of law after the jury returned its verdict, and the denial of declaratory relief. He claims that the ordinance is facially invalid and that it was enforced against him only because he expressed a view contrary to the Mayor's.

Because § 2-61 fails to limit proscribed activity to only actual disturbances, we reverse the district court's constitutionality ruling and find the statute facially invalid. However, the word "insolent" is easily removed from the ordinance without detriment to the purpose of § 2-61 and it need not be wholly invalidated since it was properly applied to Acosta's disruptive behavior. We affirm the remainder of the district court's determinations.

# I

Petitioner-Appellant Benito Acosta is a U.S. citizen of Mexican descent who resides in Orange County, California. Acosta is a founding member of the Colectivo Tonantizin, an organization that represents the rights of undocumented and immigrant workers and their families. Defendants are the City of Costa Mesa ("City"), Mayor Allan Mansoor (the "Mayor"), Chief of Police John Hensley, and several individual police officers.[1]

The Costa Mesa City Council meets on the first and third Tuesday of every month, with a public portion commencing at 6:00 p.m. The Mayor is the presiding officer who chairs the meeting. In compliance with California law, members of the public may address the City Council concerning any item listed on the meeting agenda at the time designated for public comment.[2] Speakers are each afforded three minutes to speak.

The City ordinances establish rules regulating council meetings. *See* Costa Mesa Muni. Code §§ 2-37–2-87. At issue here is § 2-61, which governs individual conduct at council meetings. A violation of § 2-61 may be prosecuted as a mis-

---

[1]The officers pertinent to the appeal are Lieutenant David Andersen, Sergeant Bryan Glass, and Officers David DeHuff, and Daniel Guth, the officers who physically ejected Acosta from the meeting after Chief Hensley directed Acosta's removal when he failed to cease his disruptive activities as requested by the Mayor.

[2]"The Ralph M. Brown Act, [California Government Code § 54950 *et seq.*], is designed to encourage public participation in government." *Coalition of Labor & Agriculture v. Cty. of Santa Barbara Bd. of Supervisors*, 28 Cal. Rptr. 3d 198, 199 (Ct. App. 2005). Section 54954.3(a) governs the circumstances under which the public must be allowed to address a local legislative body. It provides in part: "Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body . . . ."

demeanor. Meetings are recorded by video cameras and the relevant recordings are part of the record on appeal.

In December 2005 the Mayor proposed that the City enter into an agreement with Immigration and Customs Enforcement ("ICE") to have its police officers designated immigration agents with the authority to enforce federal immigration laws in the City. The proposal was placed on the City Council's December 6, 2005, agenda and passed by a vote of three to two. Members of the public were permitted to comment on the ICE agreement.

Acosta believed an agreement with ICE would undermine public safety, arguing it would deter undocumented workers from reporting crimes against them for fear of deportation. He attended the December 6 council meeting to express his opposition to the proposal. When Acosta's time came to speak, the video recordings show that he was visibly emotional and agitated.[3] Toward the end of his comments he called the Mayor a "racist pig," at which point the Mayor told Acosta to stop. Acosta repeated his slur, which prompted the Mayor to cut Acosta's speaking time short by calling for a recess. Acosta then responded by calling the Mayor a "fucking racist pig." The Council nonetheless passed the proposal.

After receiving local and national media attention, the City Council again placed the ICE agreement on the agenda of the

---

[3]Acosta submitted a DVD that shows Acosta's remarks at the December 6, 2005, meeting. Three DVDs of the January 3, 2006, meeting were introduced into evidence. Acosta submitted one DVD that shows the relevant portions of proposal supporter Jim Gilchrist's speech and Acosta's speech in opposition. It also includes local news footage taken once Acosta was removed from the chambers. Acosta also submitted a DVD of footage taken by an immigration watch dog group. This DVD depicts the meeting from a different angle that includes more footage of the audience. Appellees submitted a DVD that shows the entire hour of the council meeting up to Acosta's removal and includes the Mayor's opening warning to all participants that they could be removed for causing a disturbance.

next regular Council meeting on January 3, 2006. Prior to that meeting, groups supporting and opposing the agreement demonstrated outside City Hall. Council Chambers was filled to overflow capacity and additional demonstrators remained outside. During the public comment portion of the meeting a total of twenty-five speakers addressed the City Council, fifteen in favor of the agreement and ten against.

Jim Gilchrist, co-founder of the Minuteman Project, was one of the first speakers in favor of the ICE agreement. At the beginning of his time he turned to the audience and stated that he would like for the supporters of his position to stand silently at the end of his speech. Some members of the audience began to stand. The Mayor interrupted to clarify whether Gilchrist was asking for people to stand to show that he would be the only speaker representing this group.[4] Gilchrist turned back to the Mayor and agreed that he was representing the views of the entire group. The Mayor then stated that it would be helpful if the other groups could also send up one representative; he added that everyone was entitled to speak if they wished, however.

Acosta's turn to speak in opposition to the ICE agreement began about fifty minutes later. Approximately two minutes into his remarks, Acosta turned away from the council and toward the audience to ask members who agreed with his viewpoint to stand. The Mayor interrupted him, saying, "No, we're not going to do that." In defiance of that order, still facing the audience, Acosta nonetheless said "Do it" three times. Approximately twenty to thirty people stood up in response to his urging and some began clapping. The Mayor then abruptly

[4]Costa Mesa Municipal Code § 2-63 authorizes inquiry into speaker representation: "In order to expedite matters and to avoid repetitious presentations, whenever any group of persons wishes to address the council on the same subject matter, it shall be proper for the presiding officer to inquire whether or not the group has a spokesman and if so, that he be heard with the following speakers in the group to be limited to facts not already presented by the group spokesman."

recessed the meeting and indicated the council would return in a few minutes.

Acosta then turned back to face the departing council in an attempt to complete his speech. As he did so, an officer approached him at the podium. Acosta testified that at first the officers told him his time was up and moved the microphone. The officers asked Acosta to step down from the podium and leave the chambers, but Acosta did not immediately comply. Instead he repeatedly asked why his speaking time was cut short and why he was being asked to leave the podium. The officers then tried to quietly escort him out of the chambers, but Acosta stopped and asked to retrieve his notes from the podium. After he retrieved his notes, Acosta began to tell the officers not to touch him and jerked away from their attempts to guide him out of the room.

Chief Hensley approached the group and directed his officers to take Acosta out of the Council Chambers. The officers again tried to guide Acosta away from the podium, but Acosta attempted to prevent his removal by leaning away from the officers and planting his feet. Sergeant Glass testified that Acosta was "not complying" with their requests to leave and he was "stomping or placing his feet to hesitate or hamper his movement." The officers then took Acosta's arms. Acosta alleged that the officer behind him also wrapped his arm around Acosta's neck, similar to a choke hold, and that the officers kicked, dragged, and punched him while removing him. Sergeant Glass testified that Lieutenant Andersen applied an upper-body control hold with his arm across Acosta's chest and the video recording, submitted by Acosta, does not show any kind of kicking or punching.

At this point, the officers testified he was not under arrest, but only being removed to help diffuse an escalating situation. Once the officers were outside the Council Chambers, however, they encountered a large crowd and Acosta increased his efforts to resist the officers. When the officers attempted to

move Acosta into the City Hall and away from the volatile crowd of demonstrators outside City Hall (some of whom threw objects at the police), Acosta wrapped his legs and arms around a pole in an attempt to prevent the officers from moving him. The officers separated him from the pole and began moving him toward the City Hall. Acosta continued to resist, causing himself and an officer to fall to the ground. Once inside the City Hall, Acosta was placed in handcuffs. Chief Hensley and another witness testified that Acosta complained that the cuffs were making his arms hurt.

Acosta brought eleven claims against Mayor Mansoor, Chief Hensley, the City, and certain individual police officers. The claims relevant to this appeal include: (1) a First Amendment facial challenge to § 2-61; (2) a facial challenge to § 2-61 under the free speech clause of the California Constitution; (3) a request for a declaration that the defendants enforced § 2-61 in an unconstitutional manner; (4) a claim that he was unreasonably and unlawfully seized in violation of the Fourth Amendment; (5) an as-applied challenge to § 2-61 under the First Amendment; and (6) an as-applied claim under the California Constitution that sought damages. At the district court and here, the core of Acosta's argument is that § 2-61 unconstitutionally restricts speech and that as applied to him the defendants selectively enforced § 2-61 based upon Acosta's opposition and criticism of the Mayor and Council Members who supported the ICE agreement.

The defendants moved to dismiss the complaint. The district court dismissed without prejudice Acosta's facial challenges under both the U.S. and California Constitutions, but denied the motion as to the remaining claims because there were material questions of fact that a jury needed to decide— the most significant being whether Acosta's behavior disrupted the Council meeting. The court also concluded the Mayor was entitled to discretionary act immunity as to all of Acosta's state-law claims to the extent that he sought monetary damages and granted the City public entity immunity for

Acosta's as-applied challenges under the California Constitution to the extent that he sought damages.

Subsequently, the court granted in part and denied in part the defendants' motion for summary judgment. The district court denied summary judgment of Acosta's as-applied challenge under the First Amendment against the Mayor and the City because material facts were disputed, but granted it as to the officer defendants on grounds of qualified immunity when they carried out orders to remove Acosta from the room. The court also denied summary judgment on Acosta's claim for declaratory relief and his federal due process claims against the Mayor and the City. The court granted summary judgment in favor of all the defendants on Acosta's state law free speech claim, and in favor of the police-officer defendants as to his Fourth Amendment, federal due process, and false arrest claims.

The jury heard Acosta's First and Fourteenth amendment claims arising under 42 U.S.C. § 1983 against the Mayor and the City. The jury implicitly found his conduct disruptive when it rejected his First and Fourth Amendment claims. After trial, Acosta moved for renewed judgment as a matter of law and for a new trial. Defendants also requested entry of judgment on Acosta's declaratory judgment claim not tried to the jury. The district court denied both the motion for renewed judgment and Acosta's request for declaratory relief. Acosta now appeals.

II

We turn first to Acosta's facial challenge to Costa Mesa Municipal Code § 2-61.[5] We review de novo a dismissal for

---

[5]Section 2-61 provides:

(a) The presiding officer at a meeting may in his or her discretion bar from further audience before the council, or have removed

failure to state a claim. *See Kennedy v. S. Cal. Edison Co.*, 268 F.3d 763, 767 (9th Cir. 2001). We also review de novo the legal question of whether a statutory provision is constitutional. *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 786 (9th Cir. 2002).

In First Amendment jurisprudence, a person asserting a statute is overly broad need not demonstrate that his "own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.*

---

from the council chambers, any person who commits disorderly, insolent, or disruptive behavior, including but not limited to, the actions set forth in (b) below.

(b) It shall be unlawful for any person while addressing the council at a council meeting to violate any of the following rules after being called to order and warned to desist from such conduct:

> (1) No person shall make any personal, impertinent, profane, insolent, or slanderous remarks.

> (2) No person shall yell at the council in a loud, disturbing voice.

> (3) No person shall speak without being recognized by the presiding officer.

> (4) No person shall continue to speak after being told by the presiding officer that his allotted time for addressing the council has expired.

> (5) Every person shall comply with and obey the lawful orders or directives of the presiding officer.

> (6) No person shall, by disorderly, insolent, or disturbing action, speech, or otherwise, substantially delay, interrupt, or disturb the proceedings of the council.

**[1]** For a statute to be facially invalid on overbreadth grounds, it must be *substantially* overbroad. *Members of Cty. Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 80001 (1984). There must be a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801. A statute will not be held invalid simply because we can "conceive of a single impermissible application." *Broadrick*, 413 U.S. at 630.

In *Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (en banc), we held that in a limited public forum such as a city council meeting, a city's rules of decorum will not be facially overbroad "where they only permit a presiding officer to eject an attendee for actually disturbing or impeding a meeting." A city, however, cannot define actual disturbance in any way it chooses; the statute must not unnecessarily restrict protected speech. *Id.*

## A

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Because § 2-61 is part of the Municipal Code of Costa Mesa, we must apply California authority to interpret the statute. Our interpretation of § 2-61 must determine whether (1) any narrowing constructions are available to save § 2-61 without rewriting the ordinance, and if not, (2) whether the remainder of the ordinance can be severed from the constitutionally invalid text. *See In re Berry*, 436 P.2d 273, 286 (1968); *see also Planned Parenthood of Id., Inc. v. Wasden*, 376 F.3d 908, 925, 930, 935 (9th Cir. 2004).

At step one, the City argues that § 2-61 can be read narrowly to prohibit only speech that *actually* disrupts or disturbs the city council meeting. However, because of the inclusion

of the term "insolent" in § 2-61(a), this argument is unavailing.

We confronted a similar issue in *White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990). In *City of Norwalk*, the plaintiffs brought a facial challenge to a city ordinance that proscribed "personal, impertinent, slanderous or profane remarks." *Id.* at 1424.[6] The City of Norwalk, however, offered a narrow construction of the ordinance that only permitted removal when someone who made a proscribed remark was acting in a way that actually disturbed the meeting. We adopted this construction, because language after the offending phrase indicated that the prohibited conduct must be conduct which "disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting." *Id.*

In adopting the City of Norwalk's narrow construction, we held that the city council meetings, once open to public participation, are limited public forums. A council can regulate not only the time, place, and manner of speech in a limited public forum, but also the content of the speech with reasonable and viewpoint neutral regulations. *Id.* at 1425; *see also Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 27071 (9th Cir. 1995). Indeed, the very California statute that requires public

---

[6]In pertinent part, Norwalk Municipal Code § 2-1.1 provided:

> (b) Rules of Decorum. While any meeting of the City Council is in session, the following rules of order and decorum shall be observed: . . .
>
>> 3. Persons Addressing the Council . . . Each person who addresses the Council shall not make personal, impertinent, slanderous or profane remarks to any member of the Council, staff or general public. Any person who makes such remarks, or who utters loud threatening, personal or abusive language, or engages in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.

meetings to include public comment portions restricts the content of those public comments. Cal. Gov't Code § 54954.3 (permitting members of the public to address the legislative body on matters "within the subject matter jurisdiction of the legislative body").

**[2]** Here, Acosta points to § 2-61(b)(1) as the offending section of the ordinance. Section 2-61(b)(1) standing alone prohibits any "personal, impertinent, profane, insolent, or slanderous remarks." And like the clause at issue in *City of Norwalk*, that—without limitation—is an unconstitutional restriction of speech. Unlike the *City of Norwalk* ordinance, however, § 2-61 is not readily susceptible to a narrowing construction because the requirement of an actual disruption is not evident in the ordinance itself.

Though § 2-61(a) could be read to modify all of subsection (b), subsection (a) itself is constitutionally infirm. Subsection (a) significantly departs from the ordinance in *City of Norwalk* by including the modifier "insolent" to describe the type of behavior that creates an actual disruption. In *City of Norwalk*, the text of the regulation prohibited speech that "disrupts, disturbs, or otherwise impedes the orderly conduct of the Council meeting." 900 F.2d at 1426. Disrupt, disturb, and impede all refer to actions that are *actual* disruptions.

**[3]** In contrast, the text of § 2-61 prohibiting "insolent" behavior cannot be narrowed to include only an actual disruption. Insolent is defined as "proud, disdainful, haughty, arrogant, overbearing; offensively contemptuous of the rights or feelings of others" or "contemptuous of rightful authority; presumptuously or offensively contemptuous; impertinently insulting." Oxford English Dictionary Online, Oxford University Press, http://www.oed.com (quick search "insolent") (last visited July 18, 2012). This type of expressive activity could, and often likely would, fall well below the level of behavior that actually disturbs, disrupts, or impedes a city council meeting. For example, in *Norse*, we considered a First

Amendment challenge that involved what could be characterized as insolent behavior. There, the plaintiff was ejected from a city council meeting and arrested after he gave the council a silent Nazi salute in protest of the mayor's treatment of another speaker. 629 F.3d at 969. This momentary gesture caused no reaction, delay, or disturbance, and in fact the mayor did not even notice the gesture until another councilman told him of it. We held that "[a]ctual disruption means actual disruption," and a city cannot "define disruption so as to include non-disruption to invoke the aid of *Norwalk*." *Id.* at 976.

Arguably, subsection (b) could narrow the definition of insolent behavior. When read in conjunction with subsection (b)(1), however, § 2-61 deems insolent, personal, profane, impertinent, or slanderous remarks as grounds for removal. A comment amounting to nothing more than bold criticism of city council members would fall in this category, whereas complimentary comments would be allowed. Indeed, a silent thumbs down or other crude hand gesture may be used to express contempt or impertinence, thus qualifying as insolent behavior under § 2-61, but would not necessarily be disruptive. Section 2-61, as it stands, sweeps in this very type of protected expression.

Nor can § 2-61 be narrowed by reading "disorderly" or "disruptive" to restrict "insolent." The California courts follow the rule of statutory construction that gives disjunctive and distinct meaning to items separated by the word "or." The California Supreme Court has explained that "[t]he ordinary and popular meaning of the word 'or' is well settled. It has a disjunctive meaning . . . the function of the word 'or' is to mark an alternative such as either this or that." *In re Jesusa V.*, 85 P.3d 2, 24 (Cal. 2004) (internal quotation marks and citations omitted). Because "insolent" is separated from "disorderly" and "disruptive" by the word "or," it must be interpreted to mean something distinct; on the face of the

ordinance, proscribed behavior is either insolent or disorderly or disruptive.

The city's argument that the statute is less suspect because it is aimed only at behavior is also unavailing. A statute that regulates speech cannot be saved by simply adding the word conduct, behavior, or action. *See Cohen v. California*, 403 U.S. 15, 18 (1971). Indeed, in *Texas v. Johnson*, 491 U.S. 397 (1989), the Court rejected the government's argument that the statute prohibiting flag burning was aimed at conduct. The Court explained that the government's argument "cannot depend here on the distinction between written or spoken words and nonverbal conduct." *Id.* at 416. Such a distinction "is of no moment where the nonverbal conduct is expressive" and "where the regulation of that conduct is related to expression . . . ." *Id.* Here, subsection (a) regulates both speech and conduct for no other reason than the expressive nature of that conduct. Consider the thumbs down which is given to express general disapproval or the Nazi salute of *Norse*—because § 2-61 is not limited to conduct that actually disrupts the meeting, these instances of expressive, non-disruptive conduct are swept into the reach of § 2-61, but an approving thumbs up sign would not be "insolent," and therefore permissible, behavior. Thus, the City's reliance on conduct does not successfully narrow the statute.

The City's last argument is also unavailing. At oral argument, the City argued that § 2-61(b)(6) could be read to limit the entire statute. Section 2-61(b)(6) reads: "No person shall, by disorderly, insolent, or disturbing action, speech, or otherwise, substantially delay, interrupt, or disturb the proceedings of the council." But by the terms of the ordinance, subsection (b)(6) is merely one of many, non-exclusive, examples of how someone can act, under subsection (a), in a "disorderly, insolent, or disruptive" manner. And, therefore, it cannot narrow the breadth of subsection (a).

Finally, the fact that more narrowly tailored alternatives to regulate disruptive conduct are available to the City is evident

from review of other Costa Mesa ordinances. Section 2-64 states:

> It shall be unlawful for any person in the audience at a council meeting to do any of the following . . . (1) Engage in disorderly, disruptive, disturbing, delaying or boisterous conduct, such as . . . handclapping, stomping of feet, whistling, making noise, use of profane language or obscene gestures, yelling or similar demonstrations, which conduct *substantially interrupts, delays or disturbs* the peace and good order of the proceedings of the council.

(emphasis added). Similarly, § 2-60 states: "Members of the council shall not, by disorderly, insolent, or disturbing action, speech, or otherwise, substantially *delay, interrupt or disturb* the proceedings of the council." Costa Mesa Muni. Code § 2-60 (emphasis added). Both §§ 2-60 and 2-64, like the ordinance in *City of Norwalk*, only proscribe activity that actually interrupts, delays, or disturbs the council and neither broadly prohibits remarks or expressive conduct merely because they are insolent.

[4] We hold that § 2-61 is unconstitutionally overbroad on its face because it unnecessarily sweeps a substantial amount of non-disruptive protected speech or expressive conduct within its prohibiting language.

B

[5] We next must decide if, without the constitutionally infirm word "insolent," the remaining text is severable and operative—a question of California law.[7] *Leavitt v. Jane L.*,

---

[7]Although neither party briefed the issue of severability, the question of severability is an inherent part of the process of constitutional adjudication. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 507 (1985) (rejecting the argument that appellants waived the severability issue where

518 U.S. 137, 139 (1996) (per curiam). In California, and in general, severing the offending provision is the more prudent course. *Gerken v. Fair Political Practices Comm'n*, 863 P.2d 694, 698 (Cal. 1993), *see also Briseno v. Cty. of Santa Ana*, 8 Cal. Rptr. 2d 486, 490 (Ct. App. 1992) ("[I]nvalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute.").

The Costa Mesa Municipal Code contains a severance clause at § 1-32:

> It is hereby declared to be the intention of the city council that the sections, paragraphs, clauses and phrases of this Code are severable, and if any phrase, clause, sentence, paragraph or section of this Code shall be declared unconstitutional, invalid or unenforceable by the valid judgment or decree of a court of competent jurisdiction, such unconstitutionality shall not affect any of the remaining phrases, clauses, sentences, paragraphs and sections of this Code.

Like most severance clauses, this clause "calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable." *McMahan v. Cty. & Cnty. of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005) (internal quotation marks omitted). But a severance clause and mechanical severability are not dispositive. The funda-

---

they did not argue it before the appellate court after finding a part of the statute unconstitutional, deeming it "quite evident that the remainder of the statute retains its effectiveness . . . . In these circumstances, the issue of severability is no obstacle to partial invalidation, which is the course the Court of Appeals should have pursued."); *see also Randall v. Sorrell*, 548 U.S. 230, 262 (2006) (considering severability even where parties did not argue it in their briefs); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 767 (1996) (same); *New York v. United States*, 505 U.S. 144, 186 (1992) (same).

mental question is—without the infirm text—whether "the remainder is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute or constitutes a completely operative expression of the legislative intent and is not so connected with the rest of statute as to be inseparable." *Id.* (alterations and internal quotation marks omitted).

Under California law, this consideration examines three criteria— grammatical, functional, and volitional severability —all of which must be satisfied. *Id.*

1

**[6]** "An enactment passes the grammatical test where the language of the statute is mechanically severable, that is where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or *even single words*." *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 757 (Ct. App. 1999) (emphasis added). Here, it is clear that the word insolent is grammatically severable. It is simply one of three adjectives used to describe the type of behavior that warrants removal from a council meeting.[8] We have already noted that "insolent" is distinct from the words surrounding it as it is separated from them by the word "or." Thus, "the *wording* of [§ 2-61] is not affected by removal" of "insolent." *Id.* (emphasis in original); *see also* 13 Cal. Jur. Constitutional Law § 81 (2012). Without "insolent," § 2-61 proscribes disorderly or disruptive behavior, a constitutionally valid restriction.[9] *Cty. of Norwalk*, 900 F.3d at 1425.

---

[8]Indeed, according to the structure of the sentence, "insolent" must be read to modify behavior. Thus, § 2-61 prohibits disorderly behavior, insolent behavior, and disruptive behavior. It is the restriction of "insolent behavior" that is unconstitutional.

[9]Our colleague's argument in partial dissent that the severance clause, § 1-32, does not allow for the severance of one word from § 2-61 places undue weight on the fact that no California case has approved removal of

The dissent relies upon two California cases, *Long Beach Lesbian and Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 868 (Ct. App. 1993) and *County of Sonoma*, 93 Cal. Rptr. 3d at 62, to support its position that one word is not grammatically severable from a statute under California law. Both cases, however, are easily distinguished as removal of the single words in those cases fundamentally changed the meaning of the statutes. That is not the case here.

---

one word in the middle of a statute. First, the weight of California cases focus on a common sense reading without the offensive term and rarely focus so technically on the words of the severability clause. *See, e.g.*, *Briseno*, 6 Cal. Rptr. at 490 (finding unconstitutional text severable from sequential sections of the statutory scheme even where that word (family) did not occur in the subsequent sections as "any overtones of 'family' can be easily severed"). Courts have also found statutes severable where no severance clause existed. *See Denver Area Educ. Telcomms. Consortium,* 518 U.S. at 767; *Legislature v. Eu*, 816 P.2d 1309, 1335 (Cal. 1991) ("But in any event, it is clear that severance of particular provisions is permissible despite the absence of a formal severance clause.") (citing *People v. Mirmirani*, 636 P.2d 1130 (Cal. 1981)). Furthermore, California courts often ask whether the remainder of the statute—once the offending text is removed—is severable and legally operative. *See, e.g.*, *Gerken*, 863 P.2d at 699 ("*Santa Barbara* [530 P.2d 605] stands for the proposition that if a part to be severed reflects a 'substantial' portion of the electorate's purpose, *that part can and should be severed and given operative effect*.") (emphasis added); *McMahan*, 26 Cal. Rptr. 3d at 512 ("[T]he sole issue we must decide is whether the valid portion of the Care Not Cash law that requires a change from assistance through cash to assistance through services *can be severed from the admittedly invalid funding mandate*.") (emphasis added); *Barlow*, 85 Cal. Rptr. 2d at 757 ("We agree with appellants that in addition to the severability clause, section 10115.5 is mechanically and grammatically *severable from the provisions of article 1.5 declared unconstitutional . . . .*") (emphasis added); *but see Cnty. of Sonoma v. Sup. Ct. of Sonoma Cnty.*, 93 Cal. Rptr. 3d 39, 58 (Ct. App. 2009) (concluding that where one offensive word was the subject of much debate before enactment, that word "could not be severed from the remainder of the legislation"). Our reading of the weight of the cases, leads us to the conclusion that asking whether California courts allow the removal of one, non-essential, word focuses on the wrong question. Instead, our focus must be upon the remainder and whether any sections, paragraphs, clauses or phrases are severable and operative.

First, *County of Sonoma* does little to support the dissent's position that one word is not grammatically severable under California law as severability was rejected under the volitional factor and not the grammatical factor. 93 Cal. Rptr. at 62. There, the court of appeal found California Code of Civil Procedure § 1299.7(c) impermissibly allowed a minority of the county board to set employee compensation by requiring a unanimous vote of the board to veto an arbitration panel's decision regarding negotiations between a county employee union and the county. *Cnty. of Sonoma*, 93 Cal. Rprtr. at 57.

In deciding whether "unanimous" could be severed from the statute to cure the impropriety, the court assumed the word "unanimous" was grammatically and functionally severable. *Id.* at 62. The court, however, found it was not volitionally severable as it could not "be certain that the Legislature would have enacted the measure without the unanimous vote requirement" because the Senate bill analysis specifically referred to it, and because the "Legislature adopted the bill over the specific objections of local governments to the unanimous vote requirement." *Id.* Here, there is no such history with the word "insolent," nor, as we address below, was it so essential to § 2-61's purpose of ensuring the orderly conduct of the council's meeting that it cannot be removed.

*City of Long Beach* also does little to support the dissent's argument. There the appellate court held that "the [challenged] ordinance's *central* provision governing the issuance of [parade] permits unconstitutionally grants unrestrained discretion whether to grant or deny them, and that the *section* cannot be severed from the rest of the ordinance." *Cty. of Long Beach*, 17 Cal. Rptr. 2d at 865 (emphasis added). The court did not refuse to sever the word "may" as the dissent suggests, but instead asked whether the whole section that granted the City Manager improper discretion could "be severed from the rest of [the] Chapter."[10] *Id.* at 868. It held that

---

[10]We read *City of Long Beach* differently than our colleague. First, we note that the court considered *interpreting* "may" to mean "shall" as a nar-

the portions Long Beach sought to save were not severable because the invalidated *section* was the hub of the statutory scheme. *Id.* ("With the pivotal permit-granting function unconstitutionally structured, these sections have no verbal anchor or basis."). Here, § 2-61 is but a part of the City's overall scheme to maintain the decorum of City Council meetings. The sections regulating the behavior of the council members or audience members do not depend upon § 2-61 for operation. Nor is the word "insolent" pivotal to the operation of § 2-61's subsections, which enumerate examples of conduct that could warrant removal for impeding the expeditious discharge of the Council's business.

2

To be functionally severable, constitutionally infirm text must not be necessary to the ordinance's operation and purpose. *Cty. of Long Beach*, 17 Cal. Rptr. 2d at 868. Here § 2-37(a) denotes the purpose of the City Council Meeting regulations as "provid[ing] a guide for the city council and its staff for the conduct of business and for the preparations of agenda and minutes for city council meetings." Section 2-61 meets the purpose of conducting City Council business by regulating the decorum of meetings. Generally, decorum ordinances and regulations aim to reduce disruptions that detract from the efficiency and effectiveness of orderly public meetings. We see no reason to interpret § 2-61 as having a different or unconventional purpose.

---

rowing construction, not as part of its severance analysis. *Compare Cty. of Long Beach*, 17 Cal. Rptr. 2d at 868 (addressing the city's argument that "may" could be read to mean "shall") *with id.* at 86869 (turning to the severance argument). Second, even if we characterize the City of Long Beach's argument that "may" should have been read to mean "shall" as a severance argument, it still would not change our analysis as we are not considering *replacing* "insolent" with another word that has a completely different meaning, but simply cutting it from the statute.

**[7]** Removal of "insolent" does not defeat the central purpose of § 2-61. The central purpose is to prevent actual disruptions during and impediments to conducting an orderly council meeting. The remaining portion of § 2-61 stands on its own and is independently applicable, unaided by the word insolent. *Barlow*, 85 Cal. Rptr. 2d at 757. Deeming someone who "commits disorderly or disruptive behavior" removable from council meetings once called to order serves that purpose perfectly. Moreover, as a practical matter, it would certainly be possible for the City to enforce § 2-61 even without being able to restrict insolent behavior. *Nat'l Broiler Council v. Voss*, 44 F.3d 740, 749 (9th Cir. 1994) (per curiam). Section 2-61 is functionally autonomous even if we remove the restriction of insolent behavior.

3

The test for volitional severability examines whether the legislature's "attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken*, 863 P.2d at 699 (internal quotation marks omitted); *see also Cnty. of Sonoma*, 93 Cal. Rptr. 3d at 62. Volitional severability is the most important factor. *Katz v. Children's Hosp.*, 28 F.3d 1520, 1531 (9th Cir. 1994) (citing *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989)).

In *Gerken*, the California Supreme Court explained that part of a statute, or in that case a voter-approved initiative, can and should be severed and given operative effect where that part reflects a substantial portion of the purpose of the legislation. *Gerken*, 863 P.2d at 699. Furthermore, the remainder "cannot be rendered vague by the absence of the invalidated provisions or be inextricably connected to them by policy considerations." *Barlow*, 85 Cal. Rptr. 2d at 757.

**[8]** When courts endeavor to answer this query, they often consider legislative history or the voter guidance materials

presented with a proposed statute. *See, e.g., id.* at 70001; *Cnty. of Sonoma*, 93 Cal. Rptr. 3d at 63. While we do not have the type of materials those courts were presented with here, we do know that Costa Mesa's ultimate purpose, as denoted in §§ 2-37 and 2-61—2-64, was to enact a scheme to regulate the conduct of not only public speakers, but also audience members and council members, so as to allow the City Council to conduct orderly meetings. We have said that all a city council can proscribe are actual disturbances. Removal of the word "insolent" still meets both the City's purpose and our legal requirements.[11]

This is not an instance like that in *City of Long Beach*, where the unconstitutional text was "the hub" of the entire statutory scheme and "without it the spokes cannot stand." In *City of Long Beach*, Long Beach Municipal Code § 560.030(c) unconstitutionally allowed unfettered discretion to the City Manager in granting parade permits in violation of the First Amendment. 17 Cal. Rptr. 2d at 868. The remaining challenged sections required permittees to secure insurance for the parade and to reimburse the City in the event of damage. The court found that the insurance and reimbursement provisions were inextricably linked to the permit requirement.

---

[11]Even assuming, as our colleague does, that Costa Mesa made a conscious choice to "go further and prohibit 'insolent' speech" under § 2-61, that would not necessarily prevent us from removing that unconstitutional restriction where we conclude that the legislature would have wanted the remaining restrictions in § 2-61 to stand. *Metromedia, Inc. v. Cty. of San Diego*, 649 P.2d 902, 90608 (Cal. 1982) ("Decisions relating to severability of partially unconstitutional legislation, however, envision a larger judicial role; even if the statute following severability is not what the enacting body originally intended, the courts can sustain the statute if severance is mechanically feasible and the legislative body would have preferred such an outcome to total invalidation."); *see also Katz*, 28 F.3d at 153132 (allowing severability under California law even where it "require[d] construing a statutory term to mean something other than what it sa[id]"). Furthermore, while not dispositive, we know that Costa Mesa would prefer excision of "insolent" to complete invalidation of § 2-61 as the City said so at oral argument.

And this makes perfect sense: without a permit there is no parade, without a parade there is no potential for damage, and with no risk there is no need for insurance. Here, however, no other provision and indeed no part of § 2-61 depends upon the term "insolent" to be operative—there are no specific consequences or punishments for speakers deemed "insolent" as opposed to those who are simply "disorderly" or "disruptive."

Therefore we find it "eminently reasonable to suppose that those who favored the [ordinance] would be happy to achieve at least some substantial portion of their purpose." *Gerken*, 863 P.2d at 699. Indeed, without the word "insolent," we see little change in § 2-61's ability to meet that goal. And the remaining text of § 2-61 is severable as it "constitutes a completely operative expression of the legislative intent." *McMahan*, 26 Cal. Rptr. 3d at 513.

**[9]** In sum, we hold § 2-61 as written is facially overbroad and unconstitutional. We also hold, however, that the offensive word—"insolent"—can easily be excised such that the remaining text can be severed and § 2-61 saved from complete invalidation.

## III

We turn next to Acosta's claim that the district court improperly granted summary judgment on his as-applied challenge to § 2-61 in favor of the City on grounds of public entity immunity to the extent that he sought damages.

### A

As a threshold matter, we note that our determination that § 2-61 is facially overbroad does not impact the district court's or our determination of Acosta's as-applied challenges. Facial and as-applied challenges can be viewed as two separate inquiries. *See Bd. of Trs. of State Univ. of New York v. Fox*, 429 U.S. 469, 48286 (1989); *Taxpayers for Vincent*,

466 U.S. at 800 n.19 (stating that an overbroad regulation of speech may be facially invalid, even though its application in the instant case is constitutional).

If a statute is found facially unconstitutional on appeal, then the district court's determination that the statute was applied in a constitutional manner may remain undisturbed. *See Cty. of Houston, Tex. v. Hill*, 482 U.S. 451, 457 (1987) (illustrating that although the Court of Appeals found a statute facially unconstitutional, the Supreme Court nevertheless left undisturbed the district court's ruling that the statute had not been applied in an unconstitutional manner). Indeed, standing for a First Amendment facial challenge does not depend on whether the complainant's own activity is shown to be constitutionally privileged. *See Bigelow v. Virginia*, 421 U.S. 809, 81516 (1975); *see also Brockett*, 472 U.S. at 503 (collecting cases that hold "an individual whose own speech may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court"). Thus, we need not reverse the jury's verdict or the court's determination on partial summary judgment on the as-applied claims against the defendants simply because we find § 2-61 facially overbroad. Instead, we will review the merits of Acosta's remaining claims on appeal.

B

We review de novo the district court's decision to grant summary judgment. *Davis v. Cty. of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Id. State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).

On appeal, Acosta challenges the district court's grant of partial summary judgment in favor of the City on Acosta's as-

applied state constitutional claim on grounds of public entity immunity, but Acosta does not challenge the grant of discretionary act immunity to the Mayor and the Chief of Police pursuant to California Government Code § 820.2.

California Government Code § 815 provides:

Except as otherwise provided by statute:

(a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

(b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person.

To challenge the district court's determination, Acosta relies upon *Young v. County of Marin*, 241 Cal. Rptr. 169 (Ct. App. 1987) and the Committee Comment to § 815, both of which carve out an exception to § 815 for constitutionally created claims.

**[10]** Under California's Tort Claims Act "public entities are immune where their employees are immune, except as otherwise provided by statute." *Caldwell v. Montoya*, 897 P.2d 1320, 1325 (Cal. 1995) (citations omitted). While Acosta is correct that *Young* notes the general exception that § 815 does not protect a public entity from liability for constitutionally created claims, he does not challenge the district court's determinations that (1) his as-applied state-law claim failed to state a claim because damages were not available to him, or (2) the Mayor and the Chief of Police are entitled to discre-

tionary act immunity.[12] Instead he claims that the district court extended California case law too far in granting the City public entity immunity.

Without any basis for an underlying claim, it is unclear to us how Acosta's claim for relief supports an exception to the rule that a public entity will be immune where the employees are immune. Acosta makes general statements that *Young* controls and therefore his damages claim predicated upon his as-applied challenge under the California Constitution qualifies as a "constitutional violation" of the type excepted from § 815. In *Young*, however, the individual actors were not granted discretionary act immunity nor did the court address whether a constitutional tort action for damages should be recognized. Both of these unchallenged determinations fatally undermine Acosta's argument.

**[11]** Because the Mayor and the Chief of Police are immune, California's general principle that a public entity is immune where its employees are immune controls. And as there are no independent grounds, either in the language or history of the section, to support implying a constitutional tort action, *Degrassi*, 58 P.3d at 366, Acosta's mere citation to the free speech clause does little to bolster his argument that the City was not entitled to public entity immunity. We affirm the

---

[12]Nor does Acosta argue that we should recognize a constitutional tort action for damages based upon a violation of article I, § 2 of the California Constitution. Without deciding the issue, we note that the companion cases of *Degrassi v. Cook*, 58 P.3d 360 (Cal. 2002), and *Katzberg v. Regents of University of California*, 58 P.3d 339, 350 (Cal. 2002), suggest that there is no basis to recognize a constitutional tort action for damages for a violation of article I, § 2. Indeed, much like the plaintiff in *Degrassi*, 58 P.3d at 366, alternative adequate remedies were readily available to Acosta under both the California Civil Procedure Code § 1085 and the Ralph Brown Act, Government Code § 54960. *See* Cal. Gov't Code § 54960 ("The district attorney or any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this chapter . . . .").

district court's grant of summary judgment on claim two in favor of the City.

## IV

Acosta next argues that the district court erred in granting the individual police officers summary judgment on his First and Fourth Amendment claims. He argues that the officers were not entitled to qualified immunity for any of these claims. We review de novo a district court's decision to grant summary judgment on the basis of qualified immunity. *See Davis*, 478 F.3d at 1053.

## A

Again, our determination that § 2-61 is facially invalid does not impact our review of the district court's determination that the individual officers are entitled to qualified immunity. When a city council enacts an ordinance, officers are entitled to assume that the ordinance is a valid and constitutional exercise of authority. *See Grossman v. Cty. of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). If an officer reasonably relies on the council's duly enacted ordinance, then that officer is entitled to qualified immunity. *Id.* at 1210.

In *Grossman*, a doctor protested the presence of a warship carrying nuclear weapons in the Portland harbor and was arrested pursuant to a city ordinance that prohibited organized demonstrations without receiving a permit from the city parks commissioner. *Id.* at 120203. The ordinance under which the doctor was arrested was found unconstitutional, but the court held that the officer was still entitled to qualified immunity, because the officer correctly believed that the city ordinance required a permit. *Id.* at 1210. Further, the court explained that it was objectively reasonable for the officer to rely on the constitutionality of the ordinance because it had been "duly promulgated" by the city council and it was not so obviously

unconstitutional as to require a reasonable officer not to enforce it. *Id.*

**[12]** In the present case, qualified immunity still protects the officers even though we find the statute upon which they relied facially unconstitutional. Like the statute in *Grossman*, § 2-61 was duly promulgated by the proper process and was recognized as a valid portion of the Costa Mesa Municipal Code. Just as the officer in *Grossman* reasonably believed the statute constitutional, the officers here reasonably believed § 2-61 was constitutional. During oral argument, strong arguments were presented for the constitutionality of this statute and it would not be fair to require the officers of Costa Mesa to be versed in the nuances of the canons of construction such that they would recognize this statute's potential constitutional invalidity. Thus, it was objectively reasonable for the officers to believe the ordinance valid when they removed and later arrested Acosta for violating § 2-61.

B

**[13]** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Assessing whether an official is entitled to immunity is a two prong inquiry. Under the first prong we ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the second prong we examine whether the right was clearly established. *Id.* To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v.*

*al-Kidd*, 131 S. Ct. 2074, 2083 (2011). We may examine either prong first, considering the circumstances presented on appeal. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Acosta presents two arguments that the officers are not entitled to qualified immunity for seizing or arresting him: (1) he was arrested in retaliation for questioning the officers about why his time to speak was cut short and why he was asked to leave the council meeting; and (2) the officers lacked the requisite level of suspicion to seize or arrest him. Resolution of both contentions turns on whether probable cause existed to seize Acosta.

**[14]** Assuming Acosta's contention accurately reflects why he was arrested, Acosta's claim still fails under prong two of *Saucier*.[13] In *Reichle*, the Supreme Court held that it had never recognized, nor was there a clearly established First Amendment right to be free from a retaliatory arrest that is otherwise supported by probable cause. *Reichle*, 132 S. Ct. at 2097 ("[I]t was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation."). Furthermore, at the time of the Council meeting, our precedent had previously upheld restrictions on speech at city council meetings where the speech was actually disruptive and this remains the law. *See Cty. of Norwalk*, 900 F.2d at 1425; *Kindt*, 67 F.3d at 270. Thus, if Acosta's seizure and arrest were supported by probable cause, the officers are entitled to qualified immunity.

All seizures, except a narrowly defined intrusion such as the one in *Terry v. Ohio*, 392 U.S. 1 (1968), are reasonable only if the seizure is supported by probable cause. *Dunaway*

---

[13]The arresting officers testified that Acosta was not under arrest when they asked him to exit the Council Chambers. The decision to arrest him was not made until Acosta began physically resisting the officers after he was removed and was outside chambers. Acosta offered no evidence to contest these assertions.

*v. New York*, 442 U.S. 200, 214 (1979). To determine whether there was probable cause, we look to "the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While evidence supporting probable cause need not be admissible in court, it must be "legally sufficient and reliable." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002).

[15] Violations of §§ 2-61 and 2-64 are misdemeanors and a person in violation of either ordinance can be arrested. Section 2-61(b)(5) requires every person addressing the Council to "comply with and obey the lawful orders or directions of the presiding officer." Here, the Mayor first indicated that he did not want Acosta to ask people to stand up in a show of support, but Acosta defiantly continued to encourage the audience to stand. Then the Mayor called for a recess to end his disruptive behavior. Acosta remained at the podium and continued to speak after the Mayor called the recess.

[16] Given these undisputed facts, we find that probable cause existed to arrest Acosta for a violation of § 2-61 and summary judgment was properly granted in favor of the officers on this claim.[14] Thus, even assuming that Acosta was arrested in retaliation for his remarks, because probable cause existed for a violation of § 2-61, the officers are still entitled

---

[14]We note that if we were to find that no probable cause existed, the officers would still be entitled to qualified immunity. An officer is entitled to immunity where a reasonable officer would believe that probable cause existed, even if that determination was a mistake. *See Anderson*, 483 U.S. at 641; *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1983), *overruled on different grounds by Beck v. Cty. of Upland*, 527 F.3d 853, 865 (9th Cir. 2008). Here, given the Mayor's repeated directives to cease speaking, the fact that the council meeting was now in recess, and the undisputed fact that Acosta remained at the podium addressing both the audience and the council, a reasonable officer would have believed that probable cause existed to arrest Acosta for a violation of § 2-61.

to qualified immunity, not only for the removal of Acosta from the chambers, but also for his subsequent arrest. Summary judgment was properly granted in favor of the officers. The remaining question we must answer is whether the officers employed excessive force when enacting the seizure and arrest.

C

**[17]** When effecting an arrest, the Fourth Amendment requires that officers use only such force as is "objectively reasonable" under the circumstances. *Jackson v. Cty. of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). To determine whether the force used was reasonable, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 39697 (1989) (internal quotation marks omitted). Furthermore, the reasonableness must be judged from the perspective of a reasonable officer on the scene and allow for the fact that officers often have to make split-second decisions under evolving and uncertain circumstances. *Jackson*, 268 F.3d at 651.

**[18]** We find that there was no excessive force here as a matter of law. The undisputed evidence shows that the officers used only the force reasonably necessary to remove Acosta from the meeting and no reasonable jury could find excessive force as a matter of law based on that evidence. The video submitted by Acosta shows that he did not leave the podium when first asked to step down and the crowd began yelling both in support and opposition to Acosta. He also concedes that he did not leave the podium immediately. Considering the volatility of the situation and the presence of a large crowd of hostile demonstrators, the amount of force the officers used—grabbing Acosta's arms and placing him in an upper body control hold—was reasonable. Furthermore, when later placing Acosta under arrest, Acosta was kicking and flailing his body to actively resist the police. Holding him by

his limbs to control him and prevent him from injuring an officer was also not unreasonable or excessive. Therefore, Acosta fails to meet prong one of *Saucier* and qualified immunity was properly granted to the officers on Acosta's excessive force claim.

## V

Acosta asserts that it was error for the district court to admit his December 2005 remarks before the City Council in which he called the Mayor a "fucking racist pig." The district court denied Acosta's motion in limine to exclude these remarks, concluding that they were relevant to the reasonableness of the Mayor's conduct at the January 2006 meeting in recalling how Acosta behaved when addressing the Council at its December meeting. Acosta argues the district court further erred by failing to give his suggested limiting instruction:

> Evidence of the plaintiff's speech or conduct at the December 6, 2005 meeting cannot be considered for the purpose of proving that he is disruptive and that he acted in conformity with that character on January 3, 2006.

The district court rejected this argument in its order denying Acosta's motion for a new trial on grounds that Acosta failed to raise an objection to the error pursuant to Federal Rule of Civil Procedure 51(c)(1). The court had previously rejected the suggested limiting instruction finding the December statement "absolutely an act in conformity" and "highly relevant" to the January 3, 2006, meeting.

## A

We accord the district court "wide discretion in determining the admissibility of evidence under the Federal Rules."[15]

---

[15]The remaining three issues relate to Acosta's as-applied challenge that was before the jury. For the reasons set forth in Part III A, our determination that § 2-61 is facially overbroad does not require reversal of the district court on any of these issues.

*United States v. Abel*, 469 U.S. 45, 54 (1984). "Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *Id.* Furthermore, to reverse on the basis of an erroneous evidentiary ruling, we must conclude that the error was prejudicial. *See Harper v. Cty. of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008).

**[19]** Assuming that Acosta's December 2006 remarks were admitted to show conformity with a disruptive character, Acosta has failed to show prejudice resulting from this error.[16] Three videos depicting *exactly* how Acosta acted at the January 3, 2006, meeting were admitted into evidence. Having the additional videos detracts from both the significance of the December statements in comparison to the January evidence before the jury and any potential prejudice to the outcome of the trial. Furthermore, the jury was specifically instructed that conduct—and not words—could be the only basis for finding whether Acosta "substantially disrupted" the meeting. Given the overwhelming evidence of Acosta's actual disruptive behavior at the January meeting and because the instructions as given included limitations on how pure speech could not be used to support a finding that Acosta was *actually* disruptive, there is no reason to believe that the outcome of his trial was affected by the admission of the evidence. Thus, Acosta fails to show prejudice caused by the admission of the statement and we affirm the district court's denial of the motion for new trial.

---

[16]It is questionable whether the evidence was in fact offered to prove a character trait. The district court initially admitted the evidence as relevant to the Mayor's state of mind when exercising his discretion in enforcing the City's ordinances and Acosta points to nowhere in the trial record where the appellees actually argue that Acosta had a disruptive character. It ignores common experience to suggest the presiding officer would not have been influenced by his knowledge of Acosta from the December address. Judges certainly experience this in their courtrooms when lawyers approach the podium who are known to the court from prior appearances.

B

We also review the district court's rejection of a proposed jury instruction for an abuse of discretion. *See Jones v. Williams*, 297 F.3d 930, 93435 (9th Cir. 2002); *Duran*, 221 F.3d at 113031. Any error in instructing the jury in a civil case does not require reversal if it is harmless. *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1087 (9th Cir. 2005).

Acosta argues the court erred by rejecting Acosta's instruction for the reason that the contested evidence was "absolutely an act in conformity, and it is highly relevant to Mr. Acosta's actions on January 3rd, 2006." *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). If the district court's refusal to give the instruction was error, it was harmless because, as we have already noted, the district court provided an instruction that made the distinction between pure speech and speech that accompanies conduct. The instructions further specifically noted that Acosta's claims derived from the January 3, 2006, meeting. When the subsequent instructions refer to conduct, the reference was to Acosta's conduct at the January 3, 2006, meeting.

**[20]** Considering the jury instructions as a whole, the jury was properly instructed to consider only Acosta's conduct at the January 3, 2006, meeting when deciding whether he caused an actual disturbance. Thus, any error was harmless. This conclusion is further bolstered by ample evidence in the record that supports the jury's finding that Acosta actually did disrupt the January 3, 2006, meeting by defying the Mayor's order that he cease speaking.

VI

Next, Acosta argues that the district court erred in denying his renewed motion for judgment as a matter of law. He

argues that there was not substantial evidence to support the jury's verdict on his First Amendment claims. We review de novo the district court's grant or denial of a renewed motion for judgment as a matter of law. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 999 (9th Cir. 2008). We ask whether the evidence, construed in the light most favorable to the nonmoving party permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009). We must also draw all reasonable inferences in favor of the defendants, keeping in mind that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

**[21]** Here, the jury returned a verdict in favor of the defendants. The evidence presented at trial is easily interpreted to support a reasonable jury's determination that the Mayor neutrally and constitutionally applied the City's decorum rules to Acosta. Contrary to Acosta's assertion that the evidence shows the Mayor only feared a disruption and not that an actual disruption occurred, the jury could have found that the meeting was actually disrupted by Acosta addressing the audience and the audience's reaction to his urging them to stand. Indeed, the Mayor called an unplanned recess to diffuse the disruption. Acosta was not entitled to judgment as a matter of law and we affirm the district court's denial of his post-trial motion.

## VII

Finally, Acosta appeals the district court's denial of his request for a declaration that the defendants failed to apply §§ 2-61 and 2-64 in a constitutional manner at the January 3, 2006, meeting. The district court's decision to deny equitable relief is reviewed for an abuse of discretion. *See Molski v.*

*Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043, 1046 (9th Cir. 2008).

The Seventh Amendment provides that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. In our circuit, "it would be a violation of the Seventh Amendment right to jury trial for the court to disregard a jury's finding of fact." *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991). "Thus, in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.' " *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989)).

**[22]** Jury instructions numbers 14 and 15 specifically instructed the jurors to assess liability against the Mayor and the City upon finding that either or both deprived Acosta of his rights under the First Amendment. Instruction number 27 also stated that in enforcing §§ 2-61 and 2-64, the mayor could "bar a speaker from further audience . . . only if the speaker's activity itself — and *not the viewpoint* of the activity's expression — substantially impaired the conduct of the meeting." The jury rendered a verdict for the defendants. As such, the jury necessarily found that Acosta caused an actual disturbance. Considering this factual finding, it would be incongruous to declare that the defendants enforced the ordinances in an unconstitutional manner. We affirm the district court's denial of equitable relief.

## VIII

Section 2-61 is facially overbroad and therefore invalid. However, the offensive word—"insolent"—can be excised from § 2-61(a) and the remainder of the ordinance is sever-

able and operative. As to Acosta's remaining claims, we find no reversible error. The evidence amply supported the jury's verdict that Acosta caused an actual disruption of the City Council meeting.

**REVERSED in part and AFFIRMED in part.** The parties will bear their own costs on appeal.

---

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part:

The majority correctly sets forth the rule that, under California law, an unconstitutional portion of a statute can only be severed from statutory text if it is grammatically, functionally, and volitionally severable, regardless of whether the code contains a severance clause. *McMahan v. City & Cnty. of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005); *MHC Fin. Ltd. P'ship Two v. City of Santee*, 23 Cal. Rptr. 3d 622, 639 (Ct. App. 2005). "All three criteria must be satisfied" for text to be severable from the remainder of the statute. *McMahan*, 26 Cal. Rptr. 3d at 513. However, because California precedent makes clear that none of these criteria are met in this case, I must respectfully dissent from Part II.B of the opinion. Instead, I conclude that Section 2-61 is unconstitutional in its entirety, rather than just in part.

## I.

### 1. Grammatical Severability

Text is grammatically, or "mechanically severable" only when it constitutes "physically separate sections of the proposition." *Santa Barbara Sch. Dist. v. Superior Court*, 530 P.2d 605, 650 (Cal. 1975). Therefore, the majority is mistaken that statutory text embedded in the middle of a sentence is grammatically severable under California law. The fact that "inso-

lent" has a distinct meaning (a conclusion with which I agree) does not mean that it is mechanically distinct in a way that makes it grammatically severable. In fact, the only cases where California courts have determined that text was grammatically severable involved text that was an entirely different sentence or section of the statute, making it grammatically "complete and distinct." *People's Advocate, Inc. v. Superior Court*, 181 Cal. App. 3d 316, 331 (Ct. App. 1986); *see Gerken v. Fair Political Practices Comm'n*, 863 P.2d 694, 698 (Cal. 1993) ("Petitioners concede the various remaining parts of Proposition 73 meet the" grammatically separable requirement for the severability test, because the severed portion was an entirely separate provision of the statute); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989) (the invalid provision in this case was "distinct and separate" and could be "removed as a whole without affecting the *wording* of any other provision" (emphasis added)); *McMahan,* 26 Cal. Rptr. 3d at 513 ("appellants concede[d] the invalid funding mandate [was] grammatically severable" because it was a completely separate portion of the statute); *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 757 (Ct. App. 1999) (the invalid portion could be severed because it constituted an "entirely separate statute grammatically and mechanically from the invalid substantive provisions")*; Briseno v. City of Santa Ana*, 8 Cal. Rptr. 2d 486, 490 (Ct. App. 1992) (the unconstitutional word did "not even appear in [the] section" at issue); *Santa Barbara Sch. Dist.*, 530 P.2d 605 (the text severed was a separate and distinct statutory provision).

The majority cites to no California cases that have allowed one word (and the two surrounding commas) in the middle of a sentence to be grammatically severed. However, at least two California cases dealing with a similar issue refused to sever one unconstitutional word from a sentence. *See Cnty of Sonoma v. Superior Court*, 93 Cal. Rptr. 3d 39 (Ct. App. 2009) (refusing to sever the word "unanimous" from the middle of text); *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 14 Cal. App. 4th 312, 326 (1993) (refusing to

follow the city's request of replacing "may" with "shall" in the middle of a statutory sentence). Indeed, in *City of Long Beach*, the court determined that neither the offending word "may" nor the remaining unconstitutional section could be removed to save the ordinance. *Id.* at 326-327. Notwithstanding the majority's attempts to distinguish these cases, the fact still remains that the California courts were unwilling to sever one unconstitutional word from a sentence in either case.

To alter subsection (a) as the majority desires would be a modification that contravenes California's prohibition against "affecting the wording of any other provision." *Calfarm Ins. Co.*, 771 P.2d at 1256; *accord Barlow*, 85 Cal. Rptr. 2d at 757; *Maribel M. v. Superior Court*, 72 Cal. Rptr. 2d 536, 541 (Ct. App. 1998). Thus, while the distinct section can be "*separated* by [a] paragraph, sentence, clause, phrase or even single words," *Barlow*, 85 Cal. Rptr. 2d at 757, a single word cannot itself be removed from the middle of a clause or phrase to be grammatically severable.

Furthermore, the specific language of "the severability clause [is] considered in conjunction with the separate and discrete provisions of" the text to determine whether the "grammatical component of the test for severance is met." *Id.* Here, the City's severability clause only states that "sections, paragraphs, clauses and phrases of this Code are severable," rather than individual words. City of Costa Mesa's Municipal Code § 1-32. Therefore, the severability clause clearly indicates that the City did not intend something less than a phrase to be grammatically severable, which is also relevant for volitional severability (discussed below).

## 2.   Functional Severability

The majority is correct when it asserts that the constitutionally infirm text must not be necessary to the ordinance's operation and purpose for text to be functionally severable. Maj. Op. 10629-30 (citing *City of Long Beach*, 14 Cal. App. 4th

312). However, the testimony of the Chief of Police makes clear that city officials relied on the word "insolent" as a key part of Section 2-61's purpose of allowing the prohibition of constitutionally protected speech. For instance, when asked whether Section 2-61 "allowed [the police] to arrest the persons *insolent*," the Police Chief answered, "Yes." When asked whether Section 2-61 "was enforced in Costa Mesa" such that it "would be [a] violation[ ] of the municipal code" to make "insulting remarks," the Police Chief also answered "Yes."

In *City of Long Beach*, an official charged with enforcing the ordinance similarly testified that the ordinance could be enforced in an unconstitutional way. 14 Cal. App. 4th at 326. The California Court of Appeal explained that when "[f]aced with this ambivalence by the official charged with enforcing the section, [courts] *cannot* depart from its plain language." *Id.* (emphasis added). We can do no different here.

### 3. Volitional Severability

For volitional severability, "[t]he test is whether it can be said with confidence that the [enacting body]'s attention was sufficiently focused upon the parts to be severed [i.e., validated] so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken*, 863 P.2d at 699 (alterations omitted). In this case, as in *McMahan*, the "text of the initiative underscore[s] its primary objective." 26 Cal. Rptr. 3d at 514. Here, not only does subsection (a) of Section 2-61 prohibit "insolent" speech, but subsection (b) prohibits "personal, impertinent, profane, insolent, or slanderous remarks" in part (1), as well as "insolent, or disturbing action" in part (6). Because so much of Section 2-61 is aimed at prohibiting expressive speech, and this language is interwoven with language prohibiting disturbances, it is not at all clear that the enacting body's "attention was sufficiently focused" on the other purpose of only prohibiting disruptive conduct such that this ordinance would have still

been passed in its constitutional form. *See Gerken*, 863 P.2d at 699.

Under the volitional severability analysis, courts must also "examin[e] the intended function of [the] particular statutory scheme." *Barlow*, 85 Cal. Rptr. 2d at 758; *Briseno*, 8 Cal. Rptr. 2d at 490 (analyzing the "overall statutory scheme" to determine legislative intent). Section 2-61 clearly prohibits expressive speech through the word "insolent," whereas the majority aptly notes that other City ordinances merely prohibit speech that "substantially delays, interrupts or disturbs" a meeting. Maj. Op. 10651 (citing Sections 2-60, 2-64). In previous cases, we have explained that, when the enacting body uses language that is distinct from similar statutes, we must give meaning to that distinction. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 937 (9th Cir. 2004). Thus, in *Wasden*, we held that "the fact that Idaho chose to provide a novel definition, narrower than those given in more than half of its sister states, obligates us to consider what it meant by making that considered choice." *Id.* Similarly here, use of appropriate qualifying language by the City of Costa Mesa in Sections 2-60 and 2-64 demonstrates that the City knew how to effectuate an ordinance aimed merely at preventing meeting disturbances. The City's choice to go further and prohibit "insolent" speech under Section 2-61 demonstrates a meaningful difference that we cannot ignore, indicating that the City intended the prohibition of "insolence" to be an important aspect of Section 2-61.

The majority also relies on *Metromedia, Inc. v. City of San Diego*, 649 P.2d 902 (Cal. 1982), and *Katz v. Children's Hosp. of Orange County*, 28 F.3d 1520 (9th Cir. 1994), for the proposition that courts can sever a portion of a statute, even when that is contrary to the legislature's conscious purpose in enacting the statute. Maj. Op. 10632 n.11. However, *Metromedia, Inc.* actually stands for the opposite proposition. In *Metromedia, Inc.*, the California Supreme Court explained that "we know of no precedent for holding that a clause of a

statute, which as enacted is unconstitutional, may be changed in meaning in order to give it *some operation*, when admittedly it cannot operate as the Legislature intended." 649 P.2d at 908 n.10 (emphasis added) (quoting *People v. Perry*, 21 P. 423 (Cal. 1889)). Thus, the court refused to sever portions of a statute where it was "doubtful whether the purpose of the original ordinance is served by a truncated version" and the severance would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals." *Id.* at 909. Furthermore, in *Katz*, the Ninth Circuit was willing to interpret the statutory language "to mean something other than what it says," only because a previous California court had already interpreted the statute in that way. 28 F.3d at 1531.

The majority's reliance on the City's offhanded remark in favor of severance at oral argument (an argument not briefed or raised below) is unavailing, because California courts do not pay attention to a party's litigation strategy position regarding the party's preferences for a statute. In fact, in most cases it is likely that where California courts decided an invalid portion of a statute was not severable, the government entity party to the litigation would have preferred severance. *See, e.g., Cnty. of Sonoma*, 93 Cal. Rptr. 3d 39; *City of Long Beach*, 14 Cal. App. 4th at 326. Rather, California courts look to what the intentions were of the enacting body *at the time of enactment*. *See Gerken*, 863 P.2d at 699.

## II.

Even if the majority is correct, that Section 2-61 meets one or even two of California's three severability criteria, the majority's decision to sever "insolent" cannot be sustained. The failure of a statute to meet any one criteria (grammatical, functional, *or* volitional severability) provides an independent prohibition on a court's ability to sever text from a statute. *McMahan*, 26 Cal. Rptr. 3d at 513.

Further, other California cases have cautioned the use of statutory tools such as severability in the First Amendment context when an overbroad statute is at issue. For instance, in *People v. Rodriguez*, the court explained that "gradually cutting away the unconstitutional aspects of a statute by invalidating its improper applications case by case—does not respond sufficiently to the peculiarly vulnerable character of activities protected by the first amendment." 77 Cal. Rptr. 2d 676, 683 (Ct. App. 1998). For an "overbroad law hangs over people's heads like a Sword of Damocles." *Id.* (internal quotation marks and alterations omitted); *see also In re Berry*, 436 P.2d 273, 286 (Cal. 1968) (finding "the doctrine of severability . . . inapplicable" where "a provision encompasses both valid and invalid restrictions of free speech and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction" despite the existence of a severability clause). Therefore, I conclude that the word "insolent" cannot be severed from the middle of the phrase in subsection (a).

The majority agrees that subsection (b) of § 2-61 can only pass constitutional muster if it is somehow limited by subsection (a). As in *City of Long Beach*, 14 Cal. App. 4th at 327, once subsection (a) is struck down as constitutionally infirm, this results in the "remov[al of] the hub from [the ordinance's] wheel, and without it the spokes cannot stand." *Id.* Thus, I conclude that the invalidation of subsection (a) results in the constitutional collapse of Section 2-61 in its entirety.